We'll hear argument first this morning in Case 17-8151, Bucklew v. Precythe. Mr. Hockman. Mr. Chief Justice, and may it please the Court, Missouri intends to carry out Mr. Bucklew's lethal injection execution without informing medical members of the execution team of the well-documented and extremely uncommon medical condition  from the time they begin to gain venous access all the way through his eventual death. Mr. Hockman, can you tell me the current condition of your client in light of footnote 2 of your opening brief? And in particular, but not exclusively, does he still have a trach in his throat? And if he does, doesn't that moot out certain of your claims, particularly, I thought, much of the prep work and dangers related to him choking on his own blood? Doesn't the trach minimize that now? Yeah. So first to answer your question, as you know, we've requested leave to lodge the medical records from the summer. I'm happy to answer. It's obviously outside the record. Just want to make that clear. Right now, as far as I know, he still has a trach in. There is no indication about how long he's going to continue to have the trach. The trach could be removed at any time that the medical people determine it's appropriate to do so. I don't think it can moot out the case, because without, if the trach is removed, all of the problems return. As for what would happen if the trach wasn't removed, I think there would still be complications that would need to be investigated. It's a completely different set of circumstances. It's certainly true the core of the case is that the trach is removed. Sotomayor, we may be issuing a decision on, an advisory decision, because if the trach stays, it's a totally different case than if it is removed. I don't think it's an advisory decision, Your Honor. I think the problem is you have a judgment right now that says Missouri can go ahead and execute Mr. Bucklew according to the protocol that they have in place. And we don't, at this point, we cannot say, he certainly is in imminent danger if that protocol is used at a, there is no pending execution date. If that protocol is used in the future, I don't know whether the bleeding problems complicate the trach for him. That's just never been investigated. And I also don't know if the trach is even going to be there. And if the trach isn't going to be there, it doesn't serve any purpose. Sotomayor. How long has he had it now? It was put in in June. Part of the reason he may. Isn't it your job to find out if it can be removed now? Well, it certainly can be removed. The question is, he's got a progressive condition. That's, you know, discussed in the record. And so. I'm a little bit upset that you would come in and lodge medical records without having secured the information of whether he's physically capable of having the trach removed or not. So this is what we know about, I don't know whether this is the precise reason, but he is scheduled to have dental surgery for a tooth issue, that, you know, because his mouth is prone to infection. So he's going to have dental surgery. My suspicion is that they're leaving the trach in for the surgery. They don't want to take the trach out prior to the surgery. I really don't like surgery. But go ahead. Assuming nothing, because I don't know what's going to happen. It appears that your Dr. Zivit was misreading the horse study. That his four-minute estimate had to do with a different study having to do with a dog and a different agent, not the agent at issue here. Given that without that study, there's no basis to believe that this, that would take four minutes to take effect. It would likely be, I think it was the figures were at maximum 52 and the average is 20 to 30 seconds. That's the only evidence in the record. Is there anything left to your case once that information is eliminated, that factual misstatement? Yes, there is, Your Honor. Two things to say about that. In fact, the maximum period of time in that study, if you actually time it from the beginning of the infusion all the way through the time that the EEG reads zero, is 161 seconds, almost three minutes. It is true that he misremembered the time. What you have to do is you have to look at the study. I went back and we looked at the study. There's a wide range of infusion times in that study. 28 seconds to 115 seconds. And that, just for reference, Your Honor, on the infusion times in the study referred to are at, I think it's about, yeah, it's JA-265, the appendix page 265. And it talks about the infusion rate. The other thing that study indicates, which is also confirmed by Dr. Antognini's Now, here's what happened in the horse study. For the slowest horse, that slowest infusion rate, 115 seconds, that horse took the longest time, which is exactly what you'd expect, right? The horses were infused with four times, four times the amount of pentobarbital. They're much bigger than human beings, and so they take about four times. Dr. Antognini testified that he would expect 100 seconds, just about one second per cc, so something a little bit more than 100 seconds for Mr. Buckley's infusion to take place. So it's the same amount of infusion time for the horse, except it's four times as much. That's to the termination point, if that is when the EG is zero, right? That's correct. On those studies. But for major surgery, they don't wait until the EG is zero. It's what, 40, 50, something like that? That's right. So why are we concerned about the time to get to zero? Well, because there's no way to measure exactly when. There is no studies, and there's no way to measure exactly when you pass through the various stages of consciousness. And so they undertake major surgery with the EG at a much higher level. But there's no particular reason to believe that you get, well, first of all, that this reading, that reading, those ranges are somewhat disputed in the science. But regardless, the point is there's no reason to believe that it takes very long to get from the level at which you're prepped for surgery, so to speak, and all the way to zero. Why is that? Why is there no reason to believe that? Why is there no reason to believe that? Because there's, well, at this point there's nothing in the record, but there's also no real way to measure that. No, there's nothing in the record to show one way or the other. And it's a difficult situation to measure for obvious reasons. We don't conduct experiments in this sort of field. And so we're working with the information as best we can. And what I'm trying to emphasize here is that the infusion rate for Mr. Bucklew, especially compared to the whole study, is substantially slower as a proportional matter. And that's good reason to believe that Dr. Zivit's fundamental estimate that there's going to be a prolonged period of suffering, he admittedly wasn't precise. And, Justice Sotomayor, you're absolutely right that I think he just crossed up the numbers in his head from the study. But that doesn't change the fact that there's going to be several minutes. And that's only counting after they gain venous access. A large part of the claim here is what's going to happen before they gain venous access. And that's very, very important. And note, Judge Colleton's dissent specifically talked about the trial. One of the things he thought needed to be hashed out at a trial is not only, you know, this debate between Drs. Zivit and Antognini, but also whether he'll be required to lie flat, which we've now learned new information about since Judge Colleton wrote that opinion, and whether he's going to wait. Sotomayor, what new facts? Well, that's the at page 882 of the appendix, the statement from Ms. Boyles that he will lie flat. He will not lie fully supine at the time they administer the lethal drug, which I take to be strong evidence, actually. They had time to think about this. They had time to make a decision about what they wanted to represent. And what they chose to say is we'll make sure he's not lying flat at the time they begin the infusion. That's critical, because a large part, if we must prove, as Judge Colleton observed, if we must prove that the available alternative method will substantially reduce Mr. Buckley's risk of suffering, and as you know, we don't think that's necessary, but if we must, we will explain that the risk arises early in the execution process and remains high throughout, through the period that Dr. Zivit talked about. Roberts Is that because of the injection difficulty? That's right. Well, does that include the femoral injection option, or are you only talking about the regular vein? We're talking about the femoral. I think it's more or less agreed that at this summary – remember, this is a summary judgment. So at this posture of the case, there's substantial reason why a fact finder would conclude that the peripheral access is going to fail. And as I read the Respondent's brief, I mean, they make nods in the other direction, but essentially they accept, the district court accepted, the court of appeals accepted, that there's going to be – they're going to access femoral vein. We do not deny, we do not deny that they can access the femoral vein. That's going to happen. We're not denying that. The question is, how horrible is that going to be for him? The last time they accessed the femoral vein of an inmate because they failed to gain venous access, and this is at page 611 and 612 of the appendix, they did it through this cutdown procedure. The cutdown procedure, they have the kit in the room. That's page 615 to 616. This is entirely within the contemplation, what they expect to do. They are dealing with inmates, after all. Compromised veins is hardly an unusual circumstance for them. So they're going to have to access the femoral vein. And a cutdown procedure. Alitoson Do they have a certified anesthesiologist available? And did Dr. Antonini testify that any board-certified anesthesiologist would be able, in most instances, is able to access the femoral vein without a cutdown procedure? Fisher Dr. Antonini did say that. But the board-certified anesthesiologist. Alitoson Is there contrary evidence? Fisher Yes, because the board-certified anesthesiologist that I'm referring to, who previously accessed the femoral vein by a cutdown, is the same person who's going to do Mr. Buckley's execution, unless they've changed and haven't told us. It's the same person. So whatever, generally speaking, and what Dr. Antonini said, let's be absolutely clear about this. Dr. Antonini explained in his deposition, he said everyone who's board-certified is trained to access the femoral vein. But when asked point blank, does everyone have experience doing it, he said no. He said you can go decades without doing it at all. And you could lose the ability to do it. And now we have, of course, we haven't had discovery of M2 and M3, a separate issue that I'll get to in a moment. But what we know, given what we've had access to, is that this person did a cutdown. And a cutdown, the testimony is, can take 15 minutes and maybe more. And is carving into his leg. So let's paint the whole picture here. He's lying flat. That's what the Boyle's affidavit says. They're carving into his leg, causing a tremendous amount of stress. This is the worst possible set of circumstances. There's little doubt in my mind, if he doesn't have a trach, and that's absolutely true, Justice Sotomayor, if he doesn't have a trach, he would be suffering enormously, suffocating, having difficulty breathing. And this is not a short period of time. If you look, I can't state in open court. Sotomayor, is there another alternative to the cutdown? To access the femoral vein? So if we had discovery of M2 and M3, we could have a conversation with them about whether they would use an alternative, some other procedure. But we haven't had the chance to talk with them. Are there any? I believe there are, Your Honor. I believe that some people who are skilled and have a lot of experience with this can do it, sort of visualize where the femoral vein is and effectively do it. The best way to do it that you would use in a surgical setting, according to the testimony, is you'd bring an ultrasound in. There's no suggestion that there would be an ultrasound in this case. But I want to emphasize that when they, what the record shows is when they start this process, they're not going to be aware of the breathing issues. That's what happened last time. They got a one-page summary of his condition. It mentioned that he has cavernous hemangioma on the face and lip. It didn't mention the tumor in his throat. It did not indicate any breathing issues. Nothing in the record indicates they would check Mr. Buckley's airway. Nothing in the record indicates they normally, in the normal course, would monitor an inmate's respiration. Nothing in the record suggests they would have the equipment present in the room to deal with an airway collapse while he's on the table waiting for the drug to be infused, which is a very long period of time. And I was about to say before, if you look at pages 978 and 979 of the appendix, you'll see how far in advance of the time they administer the lethal drug that they begin the efforts to gain venous access. He's lying flat that entire time, the Boyle's affidavit tells us. He struggled through a cut-down procedure. He's probably bleeding from his tumor. The risk of an airway collapse is very high, and there's nothing in the room to deal with it. So I don't think, I think there's a question. If they had come to us, Justice Sotomayor, and said, you know what, we'll give you access, you can talk to M2 and M3, and what we think they're going to do is we're going to give them the information that they need to know what problems are very likely to arise. We're going to let them think about it. You can talk to them, and maybe what they'll be able to do is at the start of the process, we'll adjust the protocol and put a trach in. And that might, that would have helped. Sotomayor, let me stop you right there. Let's assume, and they're going to, I'm going to ask them this directly. It does seem very logical that the State would give an affidavit a lot better than the one they did through Mr. Boyle's that would say, no, we're not going to put him We've talked to the medical team. They have experience by their own requirements. They have training, education, and experience with two or three different ways to reach a femoral line. There's at least one of the two people who do. We've told them about the breathing problem. It's not going to be the same as the last time. And they're prepared. Assume they came in with that. No, we're not going to let you talk to them. No, we are not going to permit discovery in its traditional way. But we are making these affirmative representations to the Court. Would you have a case left at that point? I think, I think if the judgment were based on that kind, on those kinds of assurances, I would probably want to add a few. I think given the passage of time and the progressive nature of his illness, I think to be adequately informed, I mean, one of the, as you've pointed out, you know, adequate information is critical here. To be adequately informed, you probably have to do imaging studies at some reasonable time in advance of the execution. I'd want to know, I'd want to know what kind of experience they have not only with the cut down, but remember, Dr. Zivit was very clear that he would not want to just intubate on the fly someone in Mr. Buckley's condition. Why? Because that tumor is extremely sensitive. And if you've got a struggling, maybe convulsing person, even strapped down, and you're trying to put a tube down his throat so that he can breathe, the chances of a catastrophic hemorrhage are very, very high. So this has to be taken care of, thought through in advance. I think it's very complicated. And the judgment we have right now just doesn't do it for us. And I think you have to vacate and remand what you're proposing, Justice Sotomayor, is entirely sensible and could happen on remand before the trial court, and that's where it should happen, where it should have happened before. Roberts. Roberts. Could I ask you to address the reasonable alternative question? I know you think it's not required in your case, but assuming that it is, how can it be a reasonable alternative if it's never been used before? Yeah. Your Honor, I think there are a couple of reasons why that's so. First, I don't think that this Court ever said in Bays that it has to have been used before for it to be a reasonably available alternative. What I understand the language of Bays to say is the key passage is at page 57 of the opinion. No other State has adopted the method that was being proposed in Bays. And Petitioners proffered no showing that it is an equally effective manner of imposing a death sentence. Well, what do we have? Oklahoma, Mississippi, Alabama have adopted lethal gas as methods of execution in addition now to Missouri. And it's not only have we shown that it's an equally effective manner of imposing a death sentence, Dr. Antognini said so. That's his opinion. That's the evidence in the case. There's the study from Oklahoma which was done, which went through the process that would be involved in some detail, talked about the right-to-die community's favorable experiences with lethal gas. Now, it doesn't mean there's nothing to be worked out. Of course, there are details to be worked out. I don't doubt that it would have to be 100 percent pure nitrogen because I think it's actually potentially horrible if you have either a leak in the system or. But one of the things we see often in the Eighth Amendment cases is the point or allegation that things can go wrong regardless of the method of execution. And it seems to me that if you have a method that no State has ever used, that that danger is magnified. Possibly, Your Honor, but I. And yet your claim is that this is a better, a better alternative. Yeah, because here's why. I mean, when you think about what our claim is, this as-applied claim, our claim is that the officials in Missouri are going to do everything that their protocol directs them to do. I'm not assuming that there's going to be a mishap. I'm not assuming that something's going to go haywire. I'm assuming everything's going to go exactly the way they intend it, and that the process of things playing out exactly that way is going to be severe suffering for Mr. Buckley. So now we move to a situation where a method where I think it's made substantially less, the risk is substantially lower of that kind of severe suffering. And this Court's cases have made clear that mishaps in the protocol. Roberts I mean, you understand the theory between Bayes and Glossop, which is what the Eighth Amendment prohibits is the unnecessary infliction of pain. If the death penalty is constitutional, as it now is, there must be a way to administer it. But if you can show that there's another way that is less painful, then the theory is, again, that it's an Eighth Amendment claim, because it's unnecessary pain. But, again, it seems to me that you can't make that showing with respect to something that's never been used by any other State. I don't think that's true, Your Honor. I think what happened in Bayes was you had a method that, assuming it went well, that's what the background, the basis was. Remember, the analysis was comparative. You start with the background assumption in Bayes that if everything goes according to plan, there's not constitutionally significant suffering. Here, it's exactly the opposite. If everything goes according to plan, there is constitutionally significant suffering. So the relative risk of the just unknown, you know, not quite sure because it's never been played out before, which has no purchase against the background in Bayes, has enormous purchase here. It's not. Breyer. What do you do with the as I do I understand where we are is that the district court and the court of appeals assumed that you'd shown enough to deny some re-judgment to the State. You'd shown enough that this method, because of his special condition and the terrible tumors and so forth, could cause serious suffering. And now they overturned you on the second part and said, but you haven't shown that that serious suffering wouldn't occur anyway, even with your new method. All right? That's where we are. So as of this moment, though, we've been talking about the first part, and even you say a lot of conditions have changed, and some have changed, and some might have changed. And we're missing a piece of evidence about an affidavit that says, hey, the nurses and so forth do what they're supposed to do. Okay? Now, as to the second part, which is pretty hard to look at alone without the first part, as to the second part, what, in your opinion, should we do? Because the evidence in the record said, yeah, if we use nitrogen, the doctor that you mentioned said, you use nitrogen 20 seconds, 30 seconds, he'll be unconscious. Okay. But the Chief Justice, I mean, that is a point that's never been used before. And even their doctor is there listening and or knows about all this, and it all is on an assumption that now seems not to be accurate in your own view. It's the horse studies misread. So what, in your opinion, should the Court do? I have a proposal. Thank you, Justice Breyer, because I have a proposal. I think it will address Justice Sotomayor's concern as well. If you look at the appendix, at the Fourth Amendment complaint, page 85 of the appendix and page 90 of the appendix, among the allegations in the complaint is not only do we think lethal gas would be a viable alternative method, but we also say if, after adequate discovery, it turns out it might be possible, we just don't know, but it might be possible to alter a lethal injection protocol in a way that would violate constitutional standards. So if you vacate the judgment, if you remand it to the district court, in part because circumstances have changed, we don't know whether the changed circumstances will prevail at the time an execution is scheduled, but in part because circumstances have changed, if you vacate and remand, then we can go back, we can not only look into the question of what's, how the comparison in light of any new circumstances would be to the unknown aspects of lethal gas, but we can also figure out whether there are other ways to modify a lethal injection protocol that alleviate this grave concern. Alito What is your basis for arguing that there would be a shorter twilight period with lethal gas? Are you relying on Dr. Antonini's testimony for that? So, no. So just to be clear. You're not. Okay. So what are you relying on? So, so the way I understand it is the issue is not that there will be a shorter twilight period. The issue is what's the degree of suffering that takes place during the twilight period. It's the twilight period is what it is. In the period, there's a period of time where you're unconscious. Dr. Zivit thinks there's a period of time even where EGE readings are very, very low, but you can still, from his experience, sitting by patients for 20 years, you can still sense things. And there is, so there's, there's possibility for the subjective experience of suffering. The problem is that with pentobarbital, part of what happens, this is, you have a very narrow, you have an obstructed airway. And Dr. Zivit, and I'll be very quick here, Dr. Zivit just explains, you can have laminar flow, which is normal flow, or turbulent flow. Turbulent flow is a real big problem. But you're making this very complicated. Isn't the question, for what period of time will Petitioner be, not be insensate, but may have difficulty breathing? I think it's several minutes, Your Honor. All right. And how do you get to that figure with, the figure that applies there with respect to lethal gas? No, it would be less with lethal gas. Yeah, okay. What are the numbers and where does that come from? Well, the testimony from lethal gas is twofold. One, this is in the Oklahoma studies of page 736 through 747 of the appendix. Very, very quick onset of unconsciousness. And two, one of the things that lethal gas has is, it's about twice as fast. So you're relying on the Oklahoma study for that? The Oklahoma information and Dr. Antognini's testimony. Okay. But what, didn't Dr. Antognini say that it would be the same for lethal gas and for He said it would be the same as he thought pentobarbital would produce. And that was very clear. You reject his testimony. He says it's the same. So you want to accept him, you want to accept his number. Maybe there's more. That's why I'm asking this. Do you want to accept his number for lethal gas, but reject his number for pentobarbital for the current protocol? Yes, Your Honor. Even though what he said was that they are the same. Yes, Your Honor. I think we're entitled to do that. And that was the basis of Judge Collins' dissent. Thank you. Thank you, Mr. Hockman. I'd like to reserve the remaining time. Mr. Sauer. Mr. Chief Justice, and may it please the Court, Missouri's single drug protocol using pentobarbital is the most humane and effective method of execution that is currently known. Missouri has used it 20 times without any significant incident. Petitioner offers a extremely Many people have had the same condition as Mr. Buckley. Zero, Your Honor. I'm not aware of any complications. All right. So let's go to his unique circumstance. You don't deny that he has this condition. Absolutely not. You don't deny that he has a small tumor, but a tumor in his throat. The evidence is it's quite sizable, in fact. All right. Very sizable. You so answer my earlier question. It doesn't – I don't believe, and I would hate to think, that any State would intend to gratuitously subject a prisoner to untoward pain because they don't want to get a gurney that moves the head up or that they don't want to have personnel. You require it in your own regulations. You need, I think the words are, that you have to have someone, I read them earlier, with the training, education, and experience to do everything that's necessary to reach the veins, et cetera. So I'm assuming you're looking for those people and have them in place. Correct, Your Honor. So why haven't you represented that you're going to take the basic steps necessary to avoid the horrific circumstances that your adversary says can and will happen? We vigorously dispute that horrific circumstances will arise, but I believe we have made those representations. How do you – why do you dispute that? Because there's a – every stage, every stage of the predictions that are made by the Petitioner is contradicted by evidence in the record. All right. I do want to address the question about what representations we have made. At 531 of the Joint Appendix, the Director of Adult Institutions testified this is in the record. It's not a supplemental affidavit that we submitted in opposition to a stay motion. In the record is testimony that the gurney is adjustable and that the anesthesiologist has the discretion to adjust the gurney to the position that would play – that would be in the inmate's most appropriate medical interest. And that is consistent with what the execution protocol says, which is that the anesthesiologist has the discretion, for example, to locate the appropriate veins and so forth. I don't think there's any – But I'm hard-pressed. As I understand the protocol, they get that one-page – that one-page discussion that only listed his condition. The anesthesiologist – no new representation has been made that the anesthesiologist knows of his history of breathing difficulty or anything else. I disagree with that. The evidence in the record from the warden of the institution is that I know he receives his complete medical records. And I will supplement that right now by representing to the Court that the anesthesiologist has access to all the medical records. The one-page summary, the Director of Adult Institutions, it's at a higher level in the Department of Corrections, said that's the only thing that I give them. But the warden testified that he has access to the entire medical records. And the one-page summary does say he has cavernous hemangioma in the lower maxilla in the jaw. So it actually flags the issue, so to speak, for the anesthesiologist. Breyer. Do we know? That seems to be – what do you recommend that we do? I mean, the difficulty with the discussion to me that you're having right now, it's a legal difficulty, that you have the district judge and the court of appeals both assuming he's made his case on this point for summary judgment purposes. And you may be right, he hasn't. But it's unusual for us to go into a record like this, I think. And then reverse both courts on that. So then we're stuck with the other part of it, which we don't know all that much about. And the nitrogen, they have a good reason for thinking that the nitrogen won't be painful, that it works in a different way. And yet it isn't quite there in the record, and you can argue it, and that's why there was a dissent. So what strikes me is at that part, at that point, you should deal with this as a district judge, as a person, rather than a lawyer. Go back and hold a full hearing on it. Go back and find out if this man really is special, if there really is a special problem, what we know about the alternatives, all the questions that you've pointed out and that they've pointed out, which we don't have answers to. Now I – why not? I would say two things in response to that, Justice Breyer. First, the State of Missouri has a compelling interest in seeing this just and lawful sentence carried out as quickly as possible. A remand for further fact-finding, which is the principal request of the Petitioner here, would interject yet more delay before the execution of a sentence that's been in place for 22 years now. Secondly, the evidence in the record decisively, decisively supports an affirmance on either of the two alternative grounds, either of the gloss-up elements. And I'll address, if I may, the one that you raised, which is the second gloss-up element about a feasible, readily implemented alternative solution. Nitrogen hypoxia has never been tried by any State. At this time, no protocol exists for execution by nitrogen hypoxia. No State has ever tried it. In the controlling opinion in Bays, this Court said six times, including twice in the  that is untried and untested, that no State has ever used, that no study supports showing its efficacy, is not an alternative to feasible. Breyer. I mean, my reaction to that is a question mark. I mean, that it hasn't been tried, it's certainly a strike against it. But is it a fatal strike against it? And the other thing that's going on in the back of my mind is, of course, what people do think very often is, look, once we send it back on this, then they'll think of something else. And really what's going on is endless delay, because they think that the death penalty is not appropriate, okay? So can that be guarded against here? They've sworn up and down, no, we're not going to do that. I mean, we're this is really an unusual case, and, you know, you've read all that stuff. So do you have anything you want to say about that? Absolutely, Your Honor. What I would say is that it is the holding of Bays could not be clearer that if it's I'm sorry, Bays had to do with a generalized attack to a system of execution. And it basically said, if you like this system, you've got to get another because you have to propose another, because otherwise what you're trying to do is to abolish the death penalty. Your intent is to do away with the death penalty, and we're not going to let you do that. I don't actually know where in the Eighth Amendment and its history the court made up this alternative remedy idea because the Constitution certainly doesn't prohibit cruel and unusual punishment unless we can unless we can't kill you at all. But putting it aside, this is an as applied challenge is not going to abolish the death penalty for everybody. It's going to tell the state if you have an individual with a unique circumstance in which a method of execution is going to cost that person excruciating pain, cruel and unusual pain, you better find a different way. I don't understand why we would extend Bays to an as applied challenge to start with. Number two, if a statute, your statute, the court hasn't made it up, lists available alternatives, it's your job to find them and your job to put them into place. It's not the inmate's job to do that, putting aside that he neither has the resources to do it or the expertise to do it. But I'm wondering why we're assuming that Bays should be extended to an as applied challenge at all. I secondly address the question of why feasibility, there are some courts who have now held the only feasible alternative is an alternative mentioned in a state statute. So now we're in a Hobbesian circle. State gives us an option. I can't point to it. State doesn't give me an option. Now there's no alternative. We're really in a circle that you can't get out of. Why don't we just simply say once the first prong is meant and the courts below didn't they assumed it, they said there were material issues of fact, you should have gone on trial for that. I don't think the trial would have taken very long. And once that happened, you figure out how to kill him. There was a lot there. I'd like to address first, if I may, the question of whether why the second element of Bays should apply in an as applied challenge. And I'd offer four reasons for the Court's consideration. The first reason is that it is dictated by the holding and the reasoning of the Bays case. Keep in mind that Bays was decided two years after Hill v. McDonough. And in Hill v. McDonough, the argument was a challenge to a method of execution is really a challenge, an attempt to seek a de facto exemption from the death penalty. And therefore, it ought to be treated as a second or successive habeas petition. And this Court in Hill said, no, no, no, this Petitioner is actually leaving open the option that he could be executed by a different method, therefore it's not a de facto attack on the validity of the sentence. But then when Bays came around two years later, this Court held that we're adopting a second element in part because we do not want Petitioners to be able to seek a de facto exemption from the death penalty or engage in a. Sotomayor, We exempt certain people from the death penalty, the mentally ill, the incompetent, people who are young. We haven't seen that as abolishing the death penalty. We see it as an as applied exemption to a particular person or individual for whom this method is cruel and unusual. In all or virtually all of those contexts, the person who is exempted from the death penalty possesses a characteristic that undermines the peniological objectives of the death penalty. That is the holding of Roper and Atkins, Ford against Wainwright. In every one of those cases, this Court held that there was no deterrence or retributive purpose. Sotomayor, How about the constitutional principle against unusual, cruel and unusual punishment? I think every individual has that Eighth Amendment right. That is correct. And the scope of that Eighth Amendment right is what is set forth in Bayes and Glossop. Are you saying even if the method creates gruesome and brutal pain, you can still do it because there is no alternative? I believe that any Petitioner who is claiming that it would create gruesome and brutal pain must, under Bayes and Glossop, offer an alternative method that significantly reduces the pain. So you're saying that even if the method imposes gruesome, brutal pain, you can still go forward? Well, I would say, again, that that Petitioner has to, if they do. Is that a yes? Yes, it is, Your Honor. And that is the holding of Glossop. The holding of Glossop was – I mean, these kinds of predictions were made in Glossop. The closest facts of the case – the closest facts to that hypothetical were the facts of Glossop. In Glossop, the argument was that everyone who was accused of doing it would be killed. Is there any limit on that? Is there any limit to the degree of – There is a limit, Your Honor. I think the limit would occur if the method of execution were viewed as super-adding terror, pain, or disgrace within the meaning of the Court's earlier method of execution cases. So if the method of execution was so gruesome and brutal, or was even relevantly similar to the historical, gruesome methods of execution that are categorically prohibited by the Eighth Amendment, there would certainly be a claim in that context where, or in the words of Bays and Glossop, there is an attempt to deliberately inflict pain for the sake of pain. That would be categorically exempt, and in that context, the alternative method is not required. But if a Petitioner claims that, well, I'm predicting that I will suffer under these circumstances, that Petitioner must, under the logic of Bays and Glossop, plead and prove an alternative method. And one of the compelling reasons that this Court offered for that was that this Court recognized that it is, to eliminate the risk of pain completely is impossible. And that's why the Bays and Glossop context is very different. Doesn't the first prong deal with that, namely that you have to have a substantial shilling of severe pain? Doesn't that get at the concern you just identified, which is there's always going to be some degree, but it has to be a substantial risk of severe pain? I don't think it gets all the way to it. And I believe that is why Bays and Glossop adopted this as, in the words of Bays or the words of Glossop, a substantive element of this particular claim. So the question I'm trying to get back to my question, which is asking you as a prosecutor. But, look, I guess you would agree that some X has a rare medical condition. It makes the method of execution to him feel exactly like being burned at the stake. Okay? The Constitution would rule that out, wouldn't it? The Constitution would rule out burning at the stake. Absolutely. And he doesn't. He has a mental condition of some kind. It makes it exactly the same. That feels exactly the same. I would have to know more about the high. That's it. I'm making it up as I go along. Okay. But what I want is it's exactly the same to him as if you burned him at the stake. And I guess if you're going to rule out the one, you'd rule out the other. That's my thought, because I'm going to say next, he, this particular individual, will, because of his rare medical condition, feel exactly the same as if he'd been drowned to death slowly over a period of time. Okay? So that's why I think Justice Kavanaugh brought that up. But my, my, my, my, and I, and that seems to me to be the factual issue that's underlying your first point. But now we're back in the weeds with this individual. So I'm interested in your experience, and as far as you read about it and know about it, what do we do about, in your opinion, 42 years in prison, 20 years in prison, 30 years in prison, and people thinking, well, the reason is it's the courts that don't like the death penalty, and therefore there's one thing after another, and it goes on and on and on, and when we send it back here, we'll see that they'll think of a new one after this one, and, and so forth. So I, I, I think it's a serious question, and, and I would like to know what you think. If I may, Your Honor, I understand the question to be if there is an exceptional delay before the implementation of the death penalty, does that raise a question as to whether or not the prosecution can do it? Breyer. No, I'm not doing it that technically. I'm, I'm doing it because this case really exhibits, as I said, it's, it's a special case, and I think of the burning of the stakes example, and then I know that other people think that's just something they're going to bring up and lose or win, and then they go on to the next one after that and the next one after that, and I've, I've written and said, well, it's because it's very hard to do this because you want to give them basic fairness, you don't want to burn someone at the stake, and that takes time. So, so what is your take on that kind of general argument? If this Petitioner were to predict that he would experience a sensation like burning at the stake, he would be the third Petitioner, or the third set of Petitioners in the last 10 years to make that prediction. That was the precise prediction that was made in Bays and Glossop. Those Petitioners predicted that medasolam, for example, in Glossop, would not suppress the feeling that would be akin to being burned at the stake, and this Court held twice that these people must show that this is sure very likely to happen, and they must show that there's an alternative method of execution that is readily feasible. And, of course, these hypotheticals about being burned at the stake aren't really implemented in the real world. What's implemented in the real world is a situation where capital Petitioners have every incentive to engage in interminable litigation, interminable litigation, multiple challenges. So absent that second element, absent that second Bays element, what would almost certainly happen in every case is once the Petitioner had made a threshold showing on the first element and the State came up with an alternative, there would be a subsequent lawsuit or an amendment of the petition resulting in a second attack. And that's exactly what we have here. We have a Petitioner on Glossop. Sotomayor, but the reality is that there are alternatives. Many of them have not been implemented because people don't want to see them. The firing squad, electrocution. There's a whole lot of things that people don't want to accept the reality of, but they're there. And if you're going to make the person find a choice of how to kill himself, I simply haven't answered my question is, if the statute permits it, why shouldn't they be able to choose it? If they have proven, and I understand that's a big dispate here, if they have proven that the method you've initially chosen will create cruel and unusual pain. I believe statutory authorization alone is insufficient to demonstrate that something is readily implemented or known and available within the meaning of Bays. Now, if there were Petitioners, some capital Petitioners, for example, in Ohio, have been pleading things like firing squad and hanging as alternative methods of execution, where there's a historical pedigree to it. This Court has previously affirmed that that is a viable method of execution that is constitutional. There is a dispute in the courts of appeals about whether or not statutory authorization is a necessary condition to show that things are readily available. But right now in the Eighth Circuit, statutory authorization is not required. In the McGehee case last year, the Eighth Circuit said, we do not say that statutory authorization is required. So there are options available. If someone really thought that I will suffer an experience like burning at the stake, presumably that person would plead, you know, lethal gas would plead. Kagan, So are you saying, Mr. Sauer, that we would be in a different situation in this case right now if the Petitioner had instead requested an electrocution or a firing squad? Sauer It would certainly have been a stronger case. Now, what actually happened was in the second page of his complaint, he dropped a footnote saying, I'm not asking for firing squad. He mentioned firing squad, but he did not ask for it, saying that because it is not statutorily authorized. So he, for strategic or inadvertent reasons, has never presented the issue in this case, and Missouri has never taken a position on it, as to whether or not statutory authorization is a alternative, is required. Kagan May I ask a different question, which, you know, one of the things that strikes me, when I went back and looked at Bayes, there's a lot about a kind of deference to a State legislature and State officials about determining the appropriate method of execution, about giving a kind of considered judgment to the sort of pain that would be expected from an execution, as well as their interests in carrying out legitimate sentences and making decisions on that basis. But what strikes me is that when we think about that, those officials really are thinking in gross, if you know what I mean. They're thinking about a method of execution as applied to the general class of people and deciding that it's appropriate. And what, of course, makes this case very different is that it's not in gross. It's a particular person that says I have a highly unusual condition that will make the execution highly unusual, that will have me suffer highly unusual pain. And in that context, I think all of that stuff that we talked about in Bayes, about why we should refer to State-considered judgments, really falls away, because there's been no considered judgment, surely by the legislature, and in general by officials, about one particular person. And it strikes me that because that's true, the way we look at a case like this has to change. So I'm wondering, you know, what your response to that is. I think what I would say to that is the deference that Bayes and Glossop, as you described, gave to sort of the legislature, you know, as to the generalized method of execution, it would be appropriate. It would be deeply consistent with this Court's precedence to give that same kind of deference to the State officials who are implementing the execution in the concrete in this individual case. Missouri has a board-certified anesthesiologist who will be in charge of putting IVs into this particular case. Kagan. See, I'm not sure that that's true, because those officials are working within a system. They're working within a set of legislative rules that have been made in this sort of general sense. And for them to go outside that system would be, you know, and say it's not appropriate for this particular person, would be an extraordinary person for an extraordinary thing for an individual person to do. So I don't think we could realistically give the same kind of deference to that sort of decision. I think the deference that I had in mind is deference to the determinations that are made on the site as the execution is going forward, where there is uncontradicted evidence in the record in this case that the medical team is making all the medically relevant judgments. On that point, do we know that he will not be lying flat, or are you saying that doesn't matter? Both of those. We know that, first of all, it was established by the pleadings, as the majority held in the Eighth Circuit, that he pled that the State has offered to adjust the gurney to the most appropriate position, and we admitted that in our answer. In addition to that, uncontradicted testimony at page 531 of the Joint Appendix says the gurney is adjustable and it can be adjusted to the position that the anesthesiologist deems the most appropriate. And related to that, the your opposing counsel said, even if everything goes according to plan, there will still be significant suffering. Can you respond to that? I absolutely, absolutely disagree with that. The testimony about this of Dr. Antognini is that the only suffering that would occur in this execution that could be medically predicted was the suffering associated with the actual entry of the IV. In other words, the pinpricks or the cutdown procedure. Now, I say cutdown procedure. In truth, in fact, the record decisively shows that a cutdown procedure is not done in ephemeral vein. The only evidence of this is the testimony of Dr. Antognini, who says a cutdown is done on the saphenous, which is much lower down in the leg, in the ankle. A cutdown is not done on ephemeral vein. The evidence from the warden, who is not a medical person, about the one time a cutdown was done describes it as being done in the leg. So there is no evidence, and in fact, Dr. Antognini said there is no need to do a cutdown on the femoral because it is, quote, easily accessed. And in fact, it is not standard of care to use an ultrasound in accessing the femoral. So in the holding of the district court on this very point was that not only has he put in no evidence that there will be any difficulty at all accessing the femoral, but in addition to that, that he presented no argument in opposing summary judgment about any difficulty that would happen on any vein other than the peripheral veins in his arms. So there is really nothing in the summary judgment record that supports the predictions that are being made. Sotomayor, I'm sorry, there was a prior execution where a cutdown was done by, he was going to do this one, and there was problems then. Why isn't it a predictive, a reliable predictive tool to show that the same person who is going to do it now botched it earlier? There is no evidence of problems. And the only testimony in the record is from the warden, who is not a medical person, who said that a local anesthetic was given and a cutdown was done in the leg. The testimony of the doctor is that a cutdown is typically not done in the femoral, which is high in the leg, but is typically done in the saphenous, which is low in the leg. So there is no evidence in the record that any cutdown has ever been done on the femoral. Mr. Sotomayor, I believe some time ago you said there were four reasons why you thought at step two a defendant should be required to show an alternative. I'm not sure we got past the first of those four. I'm not even sure we got the first one out there, actually. And I'm curious what all four are. So the first reason is that the logic and the holding of Bays and Glossop requires or holds that this is a substantive element of any method of execution challenge. The second one is that, as Bays and Glossop both said, the death penalty is constitutional and there must be a means of carrying it out. And that reasoning applies just as much in the microcosm as to the individual Petitioner who is seeking a de facto exemption from the death penalty as it does in the macrocosm. In fact, the concerns of undue suffering that were presented in Bays and Glossop were much greater and much more sweeping than had been presented in this case because they would have applied to every single Petitioner who was subjected to the two, three drug protocols that were disputed in that case. Here we're talking about the suffering of a single Petitioner. Exactly the same balance that the Court struck by adopting the second element applies in this particular case. In addition to that, both Bays and Glossop relied on Farmer and Wilson going back to Estelle, which itself relied on Riesweber, for the proposition that there must be a showing of subjective blameworthiness in this context for there to be an Eighth Amendment violation. And Wilson said that one critical factor in whether or not there is subjectively blameworthiness is a constraint facing the official. If there is no alternative method of execution available and the official is under a directive from a jury verdict that there is a just and lawful sentence that must be carried out, then the – it's very difficult, if not impossible, to draw the inference that there is subjective blameworthiness in that particular case. Roberts. You'd better get to three quickly. That was three, Your Honor. That was three. I'm waiting for four still. And number four, of course, is the risk that we have discussed, that there is a risk of interminable litigation. And, Justice Gorsuch, I would direct your attention to the way that the alternative method was pled and proven in this particular case. We have a Petitioner who said lethal gas with no further specification in his complaint, and in the course of discovery said nothing more specific than nitrogen and possibly a hood or mask. If Missouri came up with anything specific, anything specific, any way to do this in the – But wouldn't the first prong of Bayes deal with your second, third, and fourth arguments that you just listed? I don't think it deals with them very effectively. It properly applied. In other words, substantial risk of severe harm. I don't think it does so effectively. And one of the reasons is that this Court in Bayes and Glossop was keenly aware of this fourth concern, which is the concern of adopting a rule that would leave open the possibility of challenge after challenge after challenge. Challenge after challenge. That's – I see that. But here is a person who has some evidence anyway that when you execute him, it's going to be like slowly drowning him to death, and there's a good chance of that. So in your opinion, should the person, given the Eighth Amendment, not even have the right to make that argument? This Court – And if he has the right to make that argument, then how do we avoid the situation that we're in of having to decide it? And if he has the right to make the argument that I want this alternative, how do we avoid the situation of 15 years of testing every possible method of execution? I would say two things in response to that. First, we vigorously dispute the suggestion that he's presented any competent evidence that he actually will experience something like a prolonged drowning. If you get into the details of the record, there is no evidence, competent evidence, that supports that. Secondly, if he really thought that he was going to suffer this excruciatingly, he has an option available. He can plead all kinds of alternative methods of execution that are not completely untested and completely unknown. He can plead hanging. He can plead firing squad. He was aware he could plead firing squad, but he strategically decided not to do that. Of course, if he had pleaded firing squad, it's possible that Missouri could have executed him by firing squad. But his litigation conduct indicates that that is not the goal here. The goal is to have challenge after challenge after challenge. This is his third method of execution challenge. He had two prior challenges going back to 2012, the Ringo litigation bringing a preemption challenge to Missouri's protocol, the Zink litigation bringing a facial challenge to Missouri's protocol, and now, 14 days before his first scheduled execution, for the very first time, he comes forward with an as-applied challenge that is based on a medical condition that he has had since birth and that has been for decades presented the same. Sotomayor, can you define the feasibility or feasibility? I'm sorry. Does the statute have to authorize it for it to be feasible? Missouri does any statute in a particular State. Have to authorize the method you choose? Missouri has never taken a position on that question. Take it down. I do not believe I'm compelled to do so by the way the record is presented. However, there are compelling arguments, there are strong arguments that that shouldn't be a requirement. Your Honor, I see my time is expiring. Thank you, counsel. Three minutes, Mr. Hockman. Thank you, Mr. Chief Justice. I'd like to make two points, first, about the alternative method requirement and, second, about the disposition in this case. Starting with the alternative method requirement, Justice Kagan, I think you have it exactly right that if you imagine that the State of Missouri thought about how to build a method of execution that was going to create the subjective experience that the record indicates here for everyone, that the record indicates here Mr. Bucklew would experience, nobody would do it. They wouldn't do that. I don't think so ill of Missouri or counsel on the other side to imagine they would do that, yet the alternative method requirement, as it plays out, imagines that because they were thinking about something else and because there's a way to carry out executions for lots of people, which this case doesn't call into question at all, that you can nonetheless do it in that way to this person, unless this person is able to come up with what they consider to be a specifically highly detailed way to manage their own and propose their own execution. Respectfully, I don't think that makes any sense. And I'll tell you why it doesn't make any sense. Nobody doubts, nobody doubts that when he's in his cell and he's got trouble breathing, they give him a biohazard bag. They give him gauze. They put him on a soft diet because eating hard food can cause his throat to bleed. Of course they take into consideration his physical condition, his concerns. And if they didn't, the Eighth Amendment would require them to do it in his cell. Their view of the alternative method requirement is as soon as he walks into the execution chamber, the Eighth Amendment changes. And now they don't, unless, unless he has some idea, unless he's the one who comes forward. The obligation not to do it. The language of the Eighth Amendment is clear. Cruel and unusual punishments shall not be inflicted. That's all we're saying here. And, Justice Kavanaugh, you're right. The first, the threshold issue in Bayes, that takes care of this. That is a demanding standard. It has to be a substantial risk, severe suffering. And it doesn't, isn't the role of the second prong, at least in part and maybe in full what has been called by the lower courts as the second prong, something that informs the first prong. So you determine whether something is severe and substantial in relation to other known methods of execution on the assumption that any execution can cause pain. It certainly is going to cause a lot of emotional pain. It's probably going to exceed the physical pain. I think that's true when you're talking about a facial challenge, because remember, in a facial challenge you're trying to figure out, as this Court said, all methods of execution involve some degree of pain and suffering, right? So you need something to compare it to. Is this too much? Well, compare it to, tell me what you want to compare it to. Here, we have a ready comparator. It's a healthy inmate. It's the people Missouri had in mind when they designed this protocol. Mr. Buckley's experience is going to be nothing at all like that, and miserably so. But why wouldn't we want to do the comparison, if we're going to do it in gross on a facial challenge, why wouldn't we do the comparison? If you concede it's valid there, why wouldn't we want to do the same comparison specifically when it comes to your client? Perhaps we have to look outside what Missouri has authorized, but a firing squad or whatever. Why wouldn't we do that exact same analysis in specific? May I answer? Yes. Because, Your Honor, the issue in Bays and Glossop was a concern. You have prior rulings of this Court that make clear that the Constitution in general does not define death, the death penalty, as cruel. And so there has to be a way to carry it out. This claim about this individual person doesn't call that into question at all. That's all. Roberts. Thank you, counsel. The case is submitted.